Glenn Douglas **JOHNSON** et al.,
Plaintiffs,

v.

The **BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM** et al., Defendants.

No. 74–C–142.

United States District Court,
W. D. Wisconsin.

June 13, 1974.

**230**

Michael S. Weiden of Lawton & Cates, Madison, Wis., for plaintiffs.

Le Roy L. Dalton, Asst. Atty. Gen. of Wis., Robert W. Warren, Atty. Gen. of Wis., Madison, Wis., for defendants.

JAMES E. DOYLE, District Judge.

Plaintiffs allege that they are tenured members of the faculties of several campuses of the University of Wisconsin, a state institution, and that as a result of action taken by the defendant state officials, plaintiffs will no longer be employed in their positions on and after July 1, 1974. They bring this action pursuant to 42 U.S.C. § 1983 and 28 U. S.C. § 1343(3), contending among other things that the defendants have denied the plaintiffs that minimal procedural due process which is guaranteed them by the Fourteenth Amendment. It is upon this contention alone that plaintiffs rely in their motion for a preliminary injunction to require defendants to continue the plaintiffs in their present employment unless and until minimal procedural due process is afforded them. It is to this motion that the present opinion and order are directed.

Jurisdiction is present.

I have examined all of the pleadings, affidavits, appendices and the entire record. Time has not permitted me to make factual findings in as much detail as I would wish, but I believe that those I am about to make are adequate to permit action on the pending motion. Accordingly, for the purpose of deciding the motion for a preliminary injunction, and for no other purpose, I find as fact those matters set forth in the following section of this opinion entitled "Facts."

*Facts*

The 1973–1975 University System biennial budget approved by state government confronted units of the System with serious budget contraction. The principal ingredients of this problem were: (a) a flat requirement that there be a 2.5% reduction in the base budget of the System for 1973–1974, and another 2.5% reduction for 1974–1975; and (b) reduced enrollments on several campuses of the University of Wisconsin which, under state law, required a further reduction in funds available to those campuses. By December, 1972, a number of knowledgeable University System officials, whose responsibility was to deal with budgetary matters, had concluded that there would be insufficient funds available to continue to pay the salaries of all tenured members of faculty and staff in all departments of all campuses. Some of these System officials sought and obtained from state government an additional, and transitional, one million dollar appropriation for the principal purpose of paying the salaries for 1973–1974 of those tenured members of faculty and staff whose sal-

aries could not otherwise have been paid during that year and whose salaries could not be paid thereafter. This was done in order to permit one year's notice to such persons.

The reduction in funds was allocated by the Central Administration of the System to the respective campuses on the basis of: (a) the required percentage reduction in the base budget of each campus; (b) the reduction required, campus by campus, by decreased enrollments, campus by campus.

The chancellor of each campus was assigned the responsibility to decide how to give effect to the reduction in funds for that campus. Each chancellor proceeded, in the spring of 1973, to make this decision. As a result of the respective decisions by the respective chancellors, each of the plaintiffs received a written notice on about May 15, 1973, from the chancellor of his or her campus stating that his or her position could not be funded effective June 30, 1974 (in at least one case, the effective date was a few weeks earlier than June 30, 1974).

At the time such notices were received, each of the plaintiffs was a "tenured" member of the faculty of his or her campus. The campuses of the plaintiffs included Oshkosh, Whitewater, Stevens Point, Platteville, Stout, and Eau Claire. As a tenured faculty member, each plaintiff's employment status was and is governed by Section 37.31, Wis. Stat., which provides in part that the "employment shall be permanent, during efficiency and good behavior. . . ." and that the employment "may not be terminated involuntarily, except for cause upon written charges." It has not been alleged that, at any time pertinent to this lawsuit, any of the plaintiffs was inefficient, or the behavior of any of the plaintiffs was other than good.

At all times from about May 15, 1973, to the present, efforts have been made by some or all of the defendants to provide employment within the System for the plaintiffs for the period following June 30, 1974. In some cases, these efforts have been successful. (On the present record, I am unable to make a finding as to which of the 38 plaintiffs have been assisted in this way, and which have not, although it appears that at least six have been so assisted.) However, a substantial number of the plaintiffs have not been offered other employment within the System.[1]

Initially, the defendant Regents and members of Central Administration described as "termination" the anticipated action with respect to some members of the tenured faculty and staff (that is, the kind of action which was then actually taken in the case of these plaintiffs). However, as of May 11, 1973, it was decided by the Regents that this type of action was to be referred to as "lay-off." The reasons given to the Regents and accepted by them for this change in terminology were: that the applicable state statutes did not specify fiscal exigency as a basis for termination of tenured faculty; that the persons affected would continue as tenured faculty members (but without pay and without duties); that the persons affected would be entitled to "first refusal" for reinstatement to their positions if funds again became available within two years; that efforts to find other employment for them within the System were being made and would continue to be made; and that the term "lay-off" better avoids an implication that any act or omission of the person caused the University's action. (The term "lay-off" will be used hereinafter in this opinion and order, but I imply no opinion whether the action taken concerning

1. On the present record, in view of the allegations set forth in the May 21, 1974, affidavit of John W. Morris, the plaintiffs Alfred J. Anderson, Paulis Lazda, Stephen Gosch, and Gary Pennanen, have not made the necessary showing that they are threatened with imminent and irreparable harm. Accordingly, this opinion and order will not be addressed to the situation at University of Wisconsin-Eau Claire.

these plaintiffs was a "termination," within the meaning of the Wisconsin statutes and regulations.)

With respect to tenured faculty whose employment is "terminated involuntarily," statutes and regulations of the state prescribe certain procedures as to written charges, hearings, and decision-making. With respect to "lay-offs," no procedural arrangements existed as of about May 15, 1973. Certain procedural arrangements governing the lay-offs were approved by the Regents on June 1, 1973, and the several chancellors of the campuses were informed of these arrangements on about June 13, 1973. These procedural arrangements were referred to as an "interim procedure for tenured faculty lay-off reconsideration." Plaintiffs were advised by the defendants that the interim "reconsideration" procedures, and only those procedures, were available to them. Thereafter, during the remainder of 1973 and into early 1974, such "reconsideration" procedures were engaged in. The plaintiffs have exhausted diligently the procedures made available to them by the defendants.

As prescribed by the Regents, the reconsideration procedures included the following elements:

The Regents' written description of the reconsideration procedure was to be delivered to the faculty persons affected. If requested then to do so by the faculty person, the chancellor was to have the appropriate department chairman or dean of college provide the faculty person a written explanation of the reason or reasons for the lay-off. The faculty person might then request in writing a reconsideration proceeding to review the decision to lay-off. The request for reconsideration was to be limited to:

"(a) whether there is sufficient evidence to support the decision to lay-off, and/or

"(b) whether there have been material deviations from the procedures established by the President and Chancellor relating to determination of fiscal and programmatic needs of the University."

With advice from the faculty governing body, each chancellor was to appoint a committee, to include at least five tenured faculty persons, to conduct the reconsideration proceedings. No person who took part in the original decision to lay-off a particular faculty person could sit during that faculty person's reconsideration proceeding. Presentations were to be limited to questions (a) and (b), above. Unless the faculty person waived the time requirement, a reconsideration proceeding was to be conducted within 30 days from the request for one, but in any event within 90 days. Thereafter, the committee was to report its findings and recommendations to the chancellor, and within 10 days thereafter the chancellor was to inform the faculty person of the chancellor's decision in writing. The decision of the chancellor was to be final.

Central Administration was directed by the Regents to issue guidelines to the chancellors making more specific the reconsideration procedures, and it did so on June 13. These guidelines from Central Administration recommended that:

The written explanation to be provided, when requested, should be sufficient to indicate to the affected faculty person that financial and programmatic needs had dictated staff reductions; what general policy considerations had entered into the decision; and how the particular faculty person or the particular faculty position had been chosen for lay-off.

If the affected faculty person then were to request a reconsideration proceeding, the faculty person should be afforded access to the university documents which had been used to make the decision; the proceedings before the committee should be tape-recorded; the committee proceedings should be closed unless the faculty person were to request that they be public; the faculty person should be permitted to be accompanied by counsel and to

offer the testimony of witnesses whose testimony possesses reasonably probative value, materiality, and relevancy to the lay-off decision.

The affected faculty person should be required to show that the material which was considered in the lay-off decision "was not enough to justify the decision in any case"; it should not be permissible for the faculty person "merely to ask the committee to reconsider the case because the policy decisions are alleged to be incorrect or because *all* material was not considered" (italics in the text).

The university should not place information into evidence at the reconsideration proceeding, because the basis for its decision will have been made available in advance to the affected faculty person and to the committee. It should be the responsibility of the faculty person, by placing before the committee information which bears on the issues, to convince the committee that the decision cannot be sustained.

The committee can obtain from university files whatever additional information it requires.

Before the committee closes the proceeding to deliberate on its recommendation, the university should be given the opportunity to correct what it judges to be erroneous or misleading information before the committee.

Central Administration's guidelines included an offer of assistance by university counsel to the reconsideration committee on each campus for its first proceeding, but "since these are not intended to be adversary proceedings," university counsel would not attend subsequent proceedings, although advice would be available to the committee.

Copies of the Regents' June 8, 1973, written description of the reconsideration procedure and of Central Administration's June 13, 1973, procedural guidelines were furnished to the plaintiffs and other faculty persons who had received lay-off notices. Each plaintiff requested and received a written explanation of the reason or reasons for his or her lay-off. Each plaintiff made written request for a reconsideration proceeding. However, the plaintiffs gave notice to each reconsideration committee on each campus and to the Regents, prior to the commencement of the reconsideration proceedings, that they objected to the procedures which had been prescribed; they preserved these objections throughout the proceedings, and renewed them before each reconsideration committee and the Regents, at the conclusion of the reconsideration proceedings; and the contentions now made by the plaintiffs in this lawsuit include the contentions and objections so expressed to the reconsideration committees. Neither the reconsideration committees nor the Regents acceded to plaintiff's objections to the prescribed procedures. The plaintiffs and the reconsideration committees then went forward with the proceedings.

All of the reconsideration committees and the plaintiffs were furnished with copies of the documents which are appended to the complaint as exhibits 2 through 7. These documents may be generally described as a series of communications from Central Administration to the chancellors concerning the bases upon which, and the manner in which the chancellors were to proceed on their respective campuses in coping with the reduced budgets and, particularly, in coping with the lay-off of tenured faculty. It is clear from the said communications that the ultimate choice of the bases for selection was to be exercised by each chancellor. Also, campus by campus, the reconsideration committees and the plaintiffs were furnished with various documents which purported to illuminate the bases upon which, and the manner in which the particular chancellor had arrived at the specific lay-off decisions. As to the Oshkosh campus, these documents are included in the May 21, 1974, affidavit of Betty Lou Johnson. As to the Stout campus, these documents are included in the May 22, 1974, affidavit of Wesley L. Face. As to the

Platteville campus, these documents are as described in the May 28, 1974, affidavit of Jean Helen Lawton. As to the Stevens Point campus, these documents are as described in the affidavits of Elwin G. Sigmund, dated May 23, 1974, and Gordon M. Haferbecker, dated May 22, 1974. As to the Whitewater campus, these documents are as described in the May 24, 1974, affidavit of H. Gaylon Greenhill.

From time to time, several of the reconsideration committees sought and obtained additional information from university officials in a manner in which plaintiffs did not participate. None of this additional information was of critical importance to the committees' decisions.[2]

In the various proceedings, plaintiffs requested university officials, who had participated in the decisions culminating in the notices of lay-off, to appear before the reconsideration committees and to submit to questioning by plaintiffs. These requests were refused.

The members of the reconsideration committees, including the committee at Platteville, did not include persons who had taken part in the original decision to lay-off a particular faculty person.

For reasons which varied from campus to campus, the respective reconsideration committees recommended that those plaintiffs who were on the Oshkosh faculty be retained; that those plaintiffs who were on the Stout faculty be retained; that those plaintiffs who were on the Platteville campus be laid off; that those plaintiffs who were on the Stevens Point campus be retained; and that those plaintiffs who were on the Whitewater faculty be retained. The respective reconsideration committees submitted their reports and recommendations to the respective chancellors. The chancellors of the Oshkosh, Stout, Stevens Point, and Whitewater campuses rejected the recommendations of the recon-

sideration committees, declined to reconsider, and persisted in the lay-off decisions. The chancellor of the Platteville campus accepted the recommendation of the reconsideration committee, declined to reconsider, and persisted in the lay-off decisions.

## OPINION

### 1. *"Property"*

Under the law of Wisconsin, plaintiffs' employment is "permanent, during efficiency and good behavior," Sec. 37.-31(1)(a), Wis.Stat., and "may not be terminated involuntarily, except for cause," Sec. 37.31(1)(b), Wis.Stat. Defendants concede that Wisconsin statutes do not declare whether, because of reduced student enrollment or because of considerations of economy, or both, the state may cease, temporarily or permanently, the compensation and functions of teaching positions in the University System occupied by tenured persons (that is, in defendants' terminology, impose the "lay-offs"). Defendants concede also that the state courts have yet to make a clear declaration on the point. They contend that until the state courts make such a declaration, I cannot determine whether these plaintiffs are about to suffer a deprivation of "property," within the meaning of the due process clause of the Fourteenth Amendment. They urge that I abstain until the state courts have made their declaration defining plaintiffs' "property."

There is a measure of difficulty in dealing with this contention. Obviously, should the state courts decide that the defendants simply may not lay-off a tenured teacher on the basis of student enrollment or fiscal factors, however compelling they may be, the procedural issue raised by these plaintiffs would become moot. But this is not the answer which defendants expect from the state courts, I am sure; nor is it a judicial answer which appears to me probable; nor, at

---

2. I base this finding on the premise that the plaintiffs in this action have the burden of establishing, by a preponderance of the credible evidence, each factual proposition which they consider necessary to make their case.

least for the purpose of this present motion for a preliminary injunction, do the plaintiffs contend that the defendants are wholly powerless to lay off tenured faculty on the basis of student enrollment or fiscal factors, or both.

Viewed more realistically, I understand defendants to contend that, given an opportunity to pass upon the question, the state courts might decide, as a matter of state law: (1) that defendants are indeed empowered to lay-off tenured faculty at any time on the basis of student enrollment or fiscal factors, or both; and (2) that the lay-offs can be imposed without affording the tenured faculty persons any procedural protections prior to the lay-offs. I understand the contention to be that should the state courts so decide, the nature of the plaintiffs' "property" under state law would have been defined as follows:

The right to continue in their positions permanently during efficiency and good behavior, receiving their compensation and performing their teaching functions, unless student enrollment factors or fiscal factors or both warrant involuntary cessation of their compensation and their functions; provided, however, that if the involuntary cessation of their compensation and their functions is for "cause" (that is an absence of efficiency or good behavior on their part), they shall first be accorded those procedures provided by statute and by Regents' regulations promulgated by statutory authority, but that if the involuntary cessation is based on student enrollment factors or fiscal factors or both, they need be accorded no procedures prior to such cessation.

In Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (United States Supreme Court, April 16, 1974), three members of the Court held that all of the attributes of the "property" interest which an appointee acquires in a position in public employment may be completely defined by the entity which creates the position (in *Arnett*, the Congress), including whether any procedural protections whatever are to be afforded and, if so, which procedural protections and whether they are to be afforded prior to or subsequent to termination or lay-off. But six members rejected this position (opinions of Marshall, J., 4522; Powell, J., 4530; and White, J., 4532), and expressed the view that once the entity creating the position has afforded it the attribute of permanence or "tenure," then the due process clause of the Fifth or Fourteenth Amendment determines the minimal procedural protection which must attend termination or lay-off.

██ ██ I conclude that the Wisconsin legislature has invested plaintiffs' employment with a sufficient degree of permanence to prevent termination or lay-off, for whatever reason, without some minimal procedural protection afforded by the Fourteenth Amendment, whatever the elements of that protection may be judicially determined to be, and whether any particular element may be judicially required to be afforded prior to termination or lay-off, or later. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sinderman, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Arnett v. Kennedy, *supra*. A determination by the state courts as to what procedural protections, if any, are required by state law in the case of a lay-off based on student enrollment factors or fiscal factors would not determine the question whether the procedural requirements of the Fourteenth Amendment had been satisfied. Therefore, I do not consider that I should abstain.

### 2. *Procedural protections required*

Plaintiffs contend that the procedures actually afforded them were constitutionally inadequate in two respects: (a) the decision-makers (that is, the chancellors at Oshkosh, Stout, Platteville, Stevens Point, and Whitewater and the reconsideration committee at Platteville)

were not neutral or impartial; and (b) plaintiffs lacked a fair opportunity to challenge the decisions because they were deprived of information necessary to mount a challenge and because they were denied an opportunity for confrontation.

Before these specific contentions are addressed, a few general observations seem in order.

Plaintiffs contend that in determining what minimal procedural protections are required by the Fourteenth Amendment in this situation, I must look to the framework within which were decided cases like Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (hearing prior to discharge from employment by defense contractor); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (hearing prior to garnishment of wages); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (hearing prior to termination of welfare benefits); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (hearing prior to revocation of driver's license); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (repossession of consumer goods); and Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole). Also, they rely upon Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Putting *Perry* and *Roth* aside for a moment, it is clear that in each of the other cases just cited, the permissibility or impermissibility of the threatened governmental action turned upon factual questions focussed on the aggrieved person's conduct or status: whether the employee had Communist associations and sympathies; whether the employee of the garnishee was in fact indebted to the garnisher; whether the welfare recipient was cooperating with the welfare authorities in suing her estranged husband for support; whether there was a reasonable possibility that the automobile operator was at fault in an accident; whether the purchaser was in default in instalments due under the sales contract; whether the parolee had violated a condition of parole. Thus, in none of these cases was the threatened governmental action precipitated by factual circumstances unrelated to alleged performance, conduct, status, or omission on the part of the aggrieved person, as, for example, a Congressional decision to terminate the entire program of aid to families with dependent children, or a legislative decision to terminate all paroles and to require the immediate reconfinement of all parolees, or a decision by the Department of Defense to terminate the entire defense contract in the performance of which the aggrieved person was employed.

*Roth* and *Sinderman* reached the Supreme Court of the United States in such postures that the reported opinions of the Court do not permit the same observation to be made about them so flatly, but it can be said that there is nothing in the report of either case to suggest that factors such as reduced student enrollment or fiscal exigency had allegedly precipitated the non-renewals, as compared with factors that related to the particular teacher's performance or conduct.

By contrast, defendants contend, the situation here is as described in the following paragraph.

There was nothing about the performance, conduct, status, or omissions of any of the plaintiffs which precipitated the basic decisions to cease the compensation and functions of a certain number of positions occupied by tenured teachers on this campus or that, in this department or that. These basic decisions were precipitated by budgetary decisions by the governor and the legislature, and by the changing sociological or economic currents which have resulted in reduced student enrollment at certain campuses and within certain departments. At the time the governor and the legislature acted, it could not be foreseen with cer-

tainty whether their actions would require the cessation of compensation and functions of any positions occupied by tenured teachers. However, as Central Administration and the respective chancellors commenced the task of accommodating to the fiscal requirements campus by campus, and as they began to test how these accommodations could be achieved without impairing the performance of the "missions" of the respective campuses, it became apparent that some lay-offs of tenured faculty were inescapable. Certain guidelines were developed by Central Administration and certain guidelines were also developed by the chancellors of the various campuses. It was only when this accommodation was carried to its conclusion by the application of the guidelines that it became necessary to identify the specific positions occupied by tenured people, the compensation and functions of which were to be discontinued.

Certain aspects of the description of events by the defendants, as set forth in the preceding paragraph, are disputed by the plaintiffs. For example, plaintiffs allege that the choice of certain positions for lay-offs was made in an utterly arbitrary and irrational manner and not in response to coherent guidelines or standards. A few plaintiffs allege that the sequence of decisions, at least at the campus level, was predetermined by a deliberate plan specifically to oust them from their positions.[3] Nevertheless, without resolving these conflicts presently, the description of events as set forth in the preceding paragraph is generally accurate, and the resulting situation differs markedly from the situation in which the termination of the employment of a single governmental employee is being considered because of some alleged performance, conduct, status or omission of his or hers. Although the term is not altogether satisfactory, the function being performed in the latter type of situation may be described as "adjudicatory." With the possible exception of the final stages of the process involved in the present case, the function may be described as non-adjudicatory.

In one respect the two types of situations are indistinguishable: the opportunity to continue in the tenured employment is precious, and the loss grievous. But in other respects the two types of situations are distinguishable.

■ (a) At the level and at the time of the gubernatorial and legislative decision-making, at the level and at the time of the decision-making by the Regents and Central Administration, and even in the initial stages of the decision-making by the chancellors, assuming the absence of vendetta, it would have been impossible to identify those specific tenured teachers in the university system whose property interests would ultimately be impaired. It might well have been desirable (but hardly practicable above the campus level) to invite all tenured faculty into the decision-making process at each of these earlier levels and times. But I am not persuaded that the opportunity for such participation is guaranteed by the Fourteenth Amendment. I cannot discern presently the implications of such a doctrine for many other situations in which important property rights may be threatened by similar legislative and administrative decisions at similar levels and times in the course of resolving other public questions.

(b) At the levels and times in the decision-making process referred to in (a), it is unclear what the nature of the participation by all tenured faculty might have been, beyond expressions of opinion as to the comparative wisdom of one course of action or another: for example, whether any reduction in appropriations for the university system was in order; if so, at what campuses and in what amounts; if so, within a particular campus, whether in the credit-producing, academic areas or in the non-

3. These contentions are not pressed by plaintiffs in support of their present motion for a preliminary injunction.

credit-producing, non-academic areas. It is reasonable to suppose that, apart from their individual economic stakes, tenured faculty members of the university system might have a livelier interest in these matters, and that they might be better informed, than those persons wholly outside the university system. But I am not persuaded that the Fourteenth Amendment should be construed to compel that the opportunity be provided tenured faculty members for the expression of their opinions at these levels and times in the decision-making process but not to compel that the same opportunity be provided for the expression of the opinions of students or prospective students, for example, or the opinions of those who would accord a higher claim on limited public funds to an improved correctional program or to a program for the conservation of natural resources, or the opinions of taxpayers generally.

(c) The more difficult issues in the present case arise with respect to the penultimate and ultimate stages of the decision-making process. I consider the penultimate stage to have included the stage at which it was decided that within the credit-producing, academic area on each campus, the reduction in funds was to be allocated in a certain manner as between the college of letters and science and the school of business, for example; and that within the college of letters and science, the reduction in funds was to be allocated in a certain manner as between the English department and the history department, for example. In terms of sound university administration, I can see good reason to afford all tenured teachers an opportunity to be heard at this penultimate stage before the decisions are taken, and perhaps an opportunity to participate in taking the decisions. But I am not persuaded that the Fourteenth Amendment requires that a tenured teacher be afforded the opportunity to express the opinion that the college of letters and science or the history department should bear a greater or lesser share in the fiscal sacrifice.

(d) The ultimate stage in the decision-making process in this case embodied the decisions that specific, named tenured teachers, including the plaintiffs, be laid off. Campus by campus, these decisions involved a choice among tenured teachers within a particular department. Conceivably, despite the obviously awkward and unpleasant implications of such a procedure, sound university administration may require that all tenured teachers within the department be afforded the opportunity to be heard before the decisions are taken, and perhaps an opportunity to participate in taking the decisions. But it is much more difficult to determine what the Fourteenth Amendment requires at this ultimate stage. For the purpose of analysis, I suggest an example in which it has already been decided that among ten teaching positions in a history department presently occupied by tenured teachers, the occupants of three positions must be laid off.

Perhaps the initial question is whether the federal constitution requires that the basis for selection must be chosen, and the process of selection performed, by one official or one group of officials within the state university system, rather than another; for example, by a group consisting of all of the tenured members of the department, rather than by the department head, the dean of the college, or the chancellor. Perhaps the next question is whether the federal constitution requires that the selection be made on one specific basis or another: in inverse order of seniority within the department, for example; or in order of seniority; or in terms of record of performance or potential for performance; or in inverse order of seniority, but with exceptions for the necessity to retain teachers in the department with specific skills or funds of knowledge. I believe that the federal constitution is silent on these questions, and that the identity of the decision-maker and the choice of a basis for selection lie within the discretion of the state government.

■ Nevertheless, whoever the decision-maker may be and whatever the basis for selection, this ultimate step of designating specific individuals does resemble the "adjudicatory" function involved in *Greene, Sniadach, Goldberg, Bell, Fuentes,* and *Morrissey.* For example, should inverse order of seniority be made the basis of selection, it becomes a question of fact whether A, B and C are the three most junior tenured members. Or, for example, should it be decided that the selection is to be made on the basis of comparative records of performance or potential for performance, it becomes a question of fact and opinion whether A, B and C, or X, Y and Z, fare least well. I have concluded that constitutional due process does require a fair opportunity to make a showing on such questions, but not prior to the initial decision. Obviously, from the viewpoint of each teacher, an opportunity to make such a showing prior to an initial decision is more to be desired. But I have decided that the advantage to the teacher flowing from such an opportunity prior to the initial decision rather than afterward is outweighed by its burdensomeness and impracticality from an institutional viewpoint. For example, if inverse order of seniority is to be chosen as the basis for selection, undoubtedly the process of selection would be automatic in nearly every situation. On the other hand, should comparative records of performance or comparative potential for performance be chosen as the basis for selection, it is impractical to require that each of the ten tenured members be provided the opportunity to present his or her comparative evaluations.

The issue presented by the plaintiffs' motion for a preliminary injunction is whether they were deprived of constitutionally required procedural due process *after* the chancellors' initial decisions to lay them off.[4] I have discussed the stages which preceded the initial decisions to lay off the plaintiffs, in an effort to illuminate the situation which followed in the wake of those initial decisions.

■■ My basic conclusion is that, so far as the Fourteenth Amendment is concerned, a tenured teacher in a state institution is protected—substantively, so to speak—only from termination or lay-off for a constitutionally impermissible reason (such as earlier exercise of First Amendment freedom of expression, or race or religion), and from termination or lay-off which is wholly arbitrary or unreasonable. The Fourteenth Amendment requires only those procedures which are necessary to provide the tenured teacher a fair opportunity to claim this "substantive" protection. In defining these minimally required procedures, the courts must take into account not only the interest of the teacher but the institutional context.

■■ In the situation presented by the present case, I conclude that subsequent to the initial decisions by the chancellors, these particular plaintiffs were not constitutionally entitled to procedural protections which, as I have concluded above in paragraphs (a), (b), and (c), need not have been afforded to the gradually diminishing circle of tenured teachers who had become increasingly vulnerable to lay-offs as the decision-making moved through the various stages. To be more specific, I am not persuaded that after the initial decisions had been made, the Fourteenth Amendment required that plaintiffs be provided an opportunity to persuade the decision-makers that departments within their respective colleges, other than theirs, should have borne a heavier fiscal sacrifice; that non-credit-producing, non-academic areas within their respective campus structures should have borne a heavier fiscal sacrifice; that campuses, other than their respective campuses, should have borne a heavier fiscal sacrifice; or that more funds should have been appropriated to the

---

4. There is no dispute that the procedures, whether adequate or not, were provided prior to the effective date of the lay-offs.

university system. However, I believe that each plaintiff was constitutionally entitled to a fair opportunity to show: (1) that the true reason for his or her lay-off was a constitutionally impermissible reason; or (2) that, given the chain of decisions which preceded the ultimate decision designating him or her by name for lay-off, that ultimate decision was nevertheless wholly arbitrary and unreasonable. I believe that each plaintiff was constitutionally entitled to a fair opportunity to make such a showing in a proceeding within the institution, in order to permit prompt reconsideration and correction in a proper case. Also, if necessary, each plaintiff was and is constitutionally entitled to a fair opportunity to make such a showing thereafter in a court. The issue finally to be resolved on plaintiffs' motion for a preliminary injunction is what procedures are the minimum necessary to provide each plaintiff a fair opportunity to make such a showing within the institution or later in court.

I have concluded that these minimal procedures include:

furnishing each plaintiff with a reasonably adequate written statement of the basis for the initial decision to lay-off;

furnishing each plaintiff with a reasonably adequate description of the manner in which the initial decision had been arrived at;

making a reasonably adequate disclosure to each plaintiff of the information and data upon which the decision-makers had relied; and

providing each plaintiff the opportunity to respond.

In this context, I proceed to consider plaintiffs' specific contentions.

### (a) *The contention that the decision-makers were not neutral or impartial*

As I have indicated, I do not consider that, following the initial decisions by the chancellors, the plaintiffs were entitled to engage in an adversary proceeding similar to a court room trial or similar to a workmen's compensation hearing. Nor were they entitled to that kind or degree of neutrality or impartiality which must characterize a court or a hearing examiner. It was well within the powers of the state, so far as the federal constitution is concerned, to assign to the chancellors of the respective campuses the authority both to make the initial decision to lay-off specific tenured faculty members and to make the ultimate decision. The initial decision obviously had to be made by someone and the chancellor was a wholly appropriate choice. The effect of plaintiffs' contention is that the ultimate decision must then have been removed from the hands of the chancellor and placed in the hands of someone who had played no part in the making of the initial decision. While the economic interest and the perspective of the laid-off teacher is entitled to respect, the Fourteenth Amendment does not require that the institutions of state government be shaped in order to vindicate only that economic interest or that perspective.

It was constitutionally permissible for the chancellors to employ the mechanism of reconsideration committees, consisting of faculty members, to hear what plaintiffs might wish to say in response to the initial lay-off decisions, and then to submit their reports and recommendations to the chancellors. With respect to the reconsideration committee at Platteville, its membership included no one who had taken part in the original decision to lay off any of the plaintiffs. I do not imply that such an exclusion was constitutionally required, but I do hold that it was constitutionally permissible for a committee so formed to conduct the hearings and to submit its report and recommendations to the chancellor.

### (b) *The contention that the plaintiffs lacked a fair opportunity to challenge the initial decisions of the chancellors*

There are several facets to this contention, all of which appear to rest on

the theory that plaintiffs were entitled to traditional adversarial hearings. I will reserve to the conclusion of this discussion the most serious of these facets.

Plaintiffs object that they were restricted to two issues in the proceedings before the reconsideration committees: (1) whether there was sufficient evidence to support the decision to lay-off, and (2) whether there had been material deviations from the procedures established by the president and chancellor relating to determination of fiscal and programmatic needs of the university.

■ With respect to the first issue, plaintiffs contend that "sufficient evidence to support" was too vague a standard. I have already concluded that so far as the Fourteenth Amendment is concerned, plaintiffs were entitled only to the opportunity to show that the true reasons for the chancellors' initial decisions were constitutionally impermissible reasons or that the decisions were arbitrary and unreasonable. I consider that the standard of "sufficient evidence to support" is more severe than the Fourteenth Amendment requires, and that it is not too vague.

■ With respect to the second issue, plaintiffs contend that they were not informed with sufficient clarity and specificity what were "the procedures established by the president and the chancellor relating to determination of fiscal and programmatic needs of the university." Therefore, they contend, they were unable to test whether there had been material deviations from those procedures. I consider that the Fourteenth Amendment did not require the president and the chancellor to establish procedures relating to determination of fiscal and programmatic needs of the university; and that if the president and the chancellor chose to establish such procedures, the Fourteenth Amendment did not forbid material deviations from these procedures. Whether to establish such procedures, and whether to permit material deviations from them, were matters for the state government to decide.

The Fourteenth Amendment did not require that the plaintiffs be afforded a hearing on these matters. However, I conclude that the plaintiffs were informed of the established procedures sufficiently fully to permit them to make a showing on these matters.

■ Plaintiffs' more serious contention is that there was not a reasonably adequate disclosure of the bases for the initial decisions and of the manner in which they had been reached. In the context of plaintiffs' theory that they were entitled to an adversary proceeding to test whether there was "sufficient evidence to support the decision to lay-off," the term "reasonably adequate" has one meaning. In the context of the view I have taken, "reasonably adequate" has a quite different and less severe meaning. Nevertheless, I must decide whether the disclosure was "reasonably adequate."

The complaint alleges that some time after they had received their notices of lay-off, plaintiffs requested and received written letters of explanation of the reasons for the cessation of funding for their positions. I find nothing more in this record about the content of these letters, and I conclude that plaintiffs have not shown that they were inadequate as written statements of the reasons for the lay-offs.

As I have found, each of the plaintiffs was furnished with copies of the documents appended to the complaint as exhibits 2 through 7. Also, the Oshkosh plaintiffs were furnished with the documents described in the affidavit of Betty Lou Johnson; the Stout plaintiffs, with the documents described in the affidavit of Wesley L. Face; the Platteville plaintiffs, with the documents described in the affidavit of Jean Helen Lawton; the Stevens Point plaintiffs, with the documents described in the affidavit of Elwin G. Sigmund and Gordon M. Haferbecker; and the Whitewater plaintiffs, with the documents described in the affidavit of H. Gaylon Greenhill. I conclude that in this manner, each

plaintiff was furnished with a reasonably adequate description of the manner in which the initial decision had been arrived at, and also that there was a reasonably adequate disclosure of the information and data upon which the decision-makers had relied. Also, I conclude that in the course of the proceedings before the respective reconsideration committees, each plaintiff was provided the opportunity to respond.

 What is "reasonably adequate" for a non-adversary proceeding may not be for an adversary proceeding. Plaintiffs have shown in this court that the information disclosed to them was bulky and some of it amorphous. They have shown that it was not presented to the reconsideration committees in a manner resembling the presentation of evidence in court. They have shown that in some situations, such as that at Platteville, they encountered difficulty in obtaining a coherent explanation of the basis for the initial lay-off decisions, and that, as explained in some situations, the basis included judgments about personalities. But as I have observed, the Fourteenth Amendment does not forbid judgments about personalities in this situation, nor does it require adversary proceedings. The information disclosed was reasonably adequate to provide each plaintiff the opportunity to make a showing that reduced student enrollments and fiscal exigency were not in fact the precipitating causes for the decisions to lay-off tenured teachers in this department and that; and it was also reasonably adequate to provide each plaintiff the opportunity to make a showing that the ultimate decision to lay off each of them, as compared with another tenured member of their respective departments, was arbitrary and unreasonable. I emphasize the latter point. On this record, plaintiffs' allegations about the inadequacy and imprecision of the disclosure relate principally to those stages of the decision-making which preceded the ultimate stage at which the specific teachers, department by department, were selected.

Had the disclosure as it was made not been "reasonably adequate," it is possible that it could have been made adequate by permitting plaintiffs some opportunity to confront and even to cross-examine some of the decision-makers. But I hold that the opportunity to confront or to cross-examine these decision-makers is not constitutionally required when the disclosure is reasonably adequate as it was here.

### ORDER

Upon the basis of the entire record, it is hereby ordered that plaintiffs' motion for a preliminary injunction is denied.