[No. 8417-5-III.   Division Three.   May 3, 1988.]

BARBARA CHRISTENSEN, ET AL, *Appellants,* v. GLENN
TERRELL, ET AL, *Respondents.*

*William Powell* and *Powell & Morris,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Sally Savage, Assistant,* for respondents.

THOMPSON, A.C.J.—Washington State University Professors Barbara Christensen and Robert Hoskinson appeal the University's termination of their two tenured positions. The Superior Court upheld the decision of the University, finding the action was neither arbitrary and capricious nor contrary to law and did not violate the appearance of fairness doctrine. The trial court applied its inherent power standard of review. We affirm, but under a different standard of review.

On September 17, 1981, Governor Spellman issued an executive order mandating across–the–board budget reductions of 10.1 percent for all state agencies supported under the general fund. Washington State University faced a reduction of approximately $19 million for its 1981–83 biennium appropriation. Immediate steps were taken by the University to implement the reduction. President Terrell notified all units within the University to prepare

reduction plans. Broad consultation was to take place with faculty and administrators.

The Dean of the College of Business and Economics advised chairs and directors of the college to begin discussions with faculty concerning a reduction plan. Drs. Christensen and Hoskinson taught in the Office Administration Program, which was within the College of Business and Economics.

Later, the WSU Board of Regents declared a state of financial exigency pursuant to provisions in the WSU Faculty Manual. The Board authorized the president and central administration to prepare budget reductions. After consultations and plan preparation, it was decided the Office Administration Program would be eliminated. Drs. Christensen and Hoskinson occupied the only two filled positions in that program.

While budget reduction plans were being formulated, a document outlining procedures and criteria for terminating faculty members and appeal procedures was drafted and circulated for comment. The Board of Regents approved the procedural plan at a public meeting December 16, 1981. At the same meeting, the regents approved final program reductions, including elimination of Drs. Christensen's and Hoskinson's Office Administration Program.

On December 22, 1981, WSU Academic Vice–President and Provost Albert Yates notified Drs. Christensen and Hoskinson their positions had been eliminated. They were advised of their right to appeal to the Faculty Status Committee, pursuant to the procedures adopted by the regents and contained in the Faculty Manual.

An appeal followed. Two designated members of the Faculty Status Committee met with Drs. Christensen and Hoskinson and discussed with them their objections to the termination. At the meeting they were given numerous documents and written memoranda. Although requested, Drs. Christensen and Hoskinson were not given a formal hearing before the full Committee.

Pursuant to published termination procedures, the Faculty Status Committee reported its findings to President Terrell on March 2, 1982. Also, pursuant to the procedures, Drs. Christensen and Hoskinson submitted comments and exceptions to the Committee's findings and recommendations. On March 17, 1982, President Terrell notified Drs. Christensen and Hoskinson by letter that he had reviewed the findings and recommendations of the Faculty Status Committee, and the professors' comments and exceptions, and had decided to uphold the decision to terminate.

Thereafter, Drs. Christensen and Hoskinson petitioned for review by the superior court. The original petition requested review under the State Higher Education Administrative Procedure Act (HEAPA), RCW 28B.19. Later, an amendment was granted allowing petitioners to seek review alternatively under the court's inherent powers.

On September 30, 1983, the superior court held review would be under its inherent power to review administrative actions, and not pursuant to HEAPA. Finally, on January 30, 1987, the court entered judgment dismissing the petition for review, finding against Drs. Christensen and Hoskinson on all issues. The court refused to review the issue of whether the University had violated rules obligating it to attempt to find alternative positions within the University for the terminated faculty members. This appeal followed.

As a preliminary matter, Drs. Christensen and Hoskinson contend the University's actions should be reviewed under RCW 28B.19.010 *et seq.*, HEAPA. The trial court reviewed the administrative action pursuant to its inherent power, apparently believing HEAPA review is available only to those who request a formal hearing, after an informal proceeding. Here, the review undertaken by WSU was more "informal" than "formal". The difference concerns the scope of the court's review. Under the court's inherent power, we apply the arbitrary and capricious or contrary to law standard to the agency's conclusions. *Williams v. Seattle Sch. Dist. 1*, 97 Wn.2d 215, 643 P.2d 426 (1982). However, under HEAPA review, the court in addition to

the arbitrary and capricious standard applies the clearly erroneous standard, *i.e.*, after a review of the entire record, does the court have a definite and firm conviction a mistake has been committed. *Sherman v. Moloney*, 106 Wn.2d 873, 880, 725 P.2d 966 (1986); *Refai v. Central Wash. Univ.*, 49 Wn. App. 1, 7, 742 P.2d 137 (1987), *review denied*, 110 Wn.2d 1006 (1988).

Although the parties framed the issue in terms of whether the review procedures formulated by WSU, and utilized by Drs. Christensen and Hoskinson, are properly categorized as formal or informal, we view this of secondary importance. WSU had not promulgated any other procedure for these professors to use. For this reason, the University's reliance on *Rutcosky v. Board of Trustees*, 14 Wn. App. 786, 545 P.2d 567 (1976) is of no help. There, Mr. Rutcosky waited 1 year to seek *available* review after an informal determination he would be terminated for cause. Here, Drs. Christensen and Hoskinson timely and exhaustively utilized the only procedure available.

The announced purpose of HEAPA is

> to provide a uniform framework for promulgation of certain administrative rules and regulations and the conduct of hearings where contested cases arise in connection with those rules and regulations, consistent with the particular needs of institutions of higher education and the people they serve.

RCW 28B.19.010. We see no reason to apply an overly technical construction of RCW 28B.19.110(2) and .150(1)[1]

---

[1]RCW 28B.19.110(2):

"Any person who is charged with an offense potentially punishable by suspension, or termination of his relationship with the institution and . . . (c) who deems himself aggrieved by the disposition of any contested case following an informal proceeding undertaken pursuant to subsection (1) above, may have charges against him adjudicated in a formal hearing pursuant to RCW 28B.19.120: . . ."

RCW 28B.19.150(1):

"Any party, *including the institution involved*, aggrieved by a final decision in a contested case *where formal proceeding has been utilized*, whether such decision is affirmative or negative in form, is entitled to judicial review thereof *only under the provisions of this chapter*, . . ." (Italics ours.)

to require adherence to nonexistent "formal" review procedures where a party is aggrieved by the results of an informal proceeding. Thus, our review is governed by RCW 28B.19.150(6), which provides:

The court may affirm the decision appealed from, or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(a) In violation of any state or federal constitutional provisions; or
(b) In excess of the statutory authority or jurisdiction of the institution; or
(c) Made upon unlawful procedure; or
(d) Affected by other error of law; or
(e) Clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
(f) Arbitrary or capricious.

First, it is contended that WSU's actions violated Drs. Christensen's and Hoskinson's constitutional rights to procedural due process. There is no question these professors had property rights in continued employment which could not be taken absent due process. *Board of Regents v. Roth,* 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); *Perry v. Sindermann,* 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972); *Washington Educ. Ass'n v. State,* 97 Wn.2d 899, 908, 652 P.2d 1347 (1982). The dispute in this case is over what process is due.

Drs. Christensen and Hoskinson contend the University violated its own rules concerning employment termination procedures, thus denying them procedural due process. The University's Faculty Manual, in effect at the time these terminations occurred, contained a "Termination Under Extraordinary Circumstances" section, which included procedures to be followed in cases of termination due to financial exigency. In relevant part, it provided:

This termination under extraordinary circumstances is not a dismissal, but a faculty member shall have the right to have these issues reviewed by the Faculty Status

Committee where he or she believes that bona fide financial exigency or elimination of function is in question if the faculty member requests such review within 30 days after receipt of notice of termination. If a review by the Faculty Status Committee is requested, the Committee shall determine its own procedures for hearing the matter, shall conduct its review as expeditiously as possible, and shall report its findings to the President, . . .

Also, the regents had approved a document which was intended to supplement and define the above quoted section. In relevant part, the document which is entitled "Faculty Personnel Actions Under Conditions of Financial Emergency" stated:

3. In its discretion, the Faculty Status Committee *may appoint a Hearing Committee of three members to hear the appeal.* . . . Any member of the Faculty Status Committee may also be selected as one of the three Hearing Committee members.

4. The Faculty Status Committee *shall determine its own procedures* for hearing appeals, which *shall include an opportunity for the faculty member to present oral argument* to the Committee or to the Hearing Committee established pursuant to paragraph 3.

(Italics ours.) The professors alleged three violations of these procedural guidelines: The Faculty Status Committee (1) failed to formally establish procedures or communicate them to the plaintiffs; (2) improperly designated a subcommittee of two, rather than the hearing committee of three allowed for in the rules; and (3) denied them the opportunity to present oral argument to the full Committee, or to a properly constituted hearing committee.

An administrative body must follow its own rules and regulations when it conducts a proceeding which could result in depriving an individual of some benefit or entitlement. *Ritter v. Board of Comm'rs,* 96 Wn.2d 503, 507, 637 P.2d 940 (1981); *Smith v. Greene,* 86 Wn.2d 363, 373–74, 545 P.2d 550 (1976). We do not agree the Faculty Status Committee failed to establish procedures or improperly constituted a subcommittee to decide the appeal, but do

agree it did not fully comply with requirements to allow oral argument. Nevertheless, this did not violate the professors' rights to procedural due process.

■ *Danielson v. Seattle,* 108 Wn.2d 788, 797 n.3, 742 P.2d 717 (1987) is dispositive. It noted an agency's failure to follow its own rules does not per se violate procedural due process unless the agency's rules represent the minimal due process requirements. *See also Williams v. Seattle,* 607 F. Supp. 714, 719 (W.D. Wash. 1985); *Levitt v. University of Tex.,* 759 F.2d 1224, 1229–30 (5th Cir. 1985). We also note that the courts in *Smith v. Greene, supra,* and in *Ritter v. Board of Comm'rs, supra,* while reciting the general rule regarding the requirement to follow administrative rules, nevertheless upheld the decision after an analysis of procedural due process protections. Thus, the real question is whether the procedures that *were* employed satisfied federal constitutional requirements.

■ The due process clause requires that notice and an opportunity for a meaningful hearing precede the deprivation of the property interest at stake. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985). However, due process is a flexible concept, and will vary according to the relative weight of the various interests. *Goss v. Lopez,* 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975); *Danielson,* at 798; *In re Deming,* 108 Wn.2d 82, 97, 736 P.2d 639 (1987). Courts employ a balancing test to decide the parameters of the minimal procedural safeguards required. *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976). The court must weigh: (1) the private interest in retaining employment; (2) the risk of erroneous deprivation through the procedures used; and (3) the government interest, including fiscal and administrative burdens that additional or substitute procedures would entail.

*Johnson v. Board of Regents,* 377 F. Supp. 227 (W.D. Wis. 1974), *aff'd,* 510 F.2d 975 (7th Cir. 1975) is cited favorably in Washington in cases involving termination due to financial exigency. *See Refai v. Central Wash. Univ.,*

*supra* at 15–16; *Washington Educ. Ass'n v. State, supra* at 909. *Johnson,* 377 F. Supp. at 239, held in these circumstances the Fourteenth Amendment requires only those procedures which are necessary to provide the tenured teacher a fair opportunity to show that his or her termination or layoff was for a constitutionally impermissible reason, or was wholly arbitrary or unreasonable. The court held the minimal procedures required include:

> furnishing each plaintiff with a reasonably adequate written statement of the basis for the initial decision to lay–off;
> furnishing each plaintiff with a reasonably adequate description of the manner in which the initial decision had been arrived at;
> making a reasonably adequate disclosure to each plaintiff of the information and date upon which the decision–makers had relied; and
> providing each plaintiff the opportunity to respond.

*Johnson,* 377 F. Supp. at 240. It held the Fourteenth Amendment did not require faculty participation in the decision to declare a financial emergency or to decide which budget areas required reduction at the gubernatorial, legislative, regency, central administrative, and local chancellor levels. Only at the ultimate "adjudicatory" stage, when the decision is made as to which faculty members would be dismissed, are procedural protections required.

In this case, faculty input was allowed at all stages of the decisionmaking process, both adjudicatory and nonadjudicatory. All faculty were advised of the declaration of financial exigency by the Board of Regents. Drafts of a proposed reduction plan, which included elimination of Drs. Christensen's and Hoskinson's program, were circulated for comment. Objections from faculty, including Drs. Christensen and Hoskinson, were submitted. The input was passed along to the academic vice–president and provost. Drafts of the layoff procedure plans were distributed for comment and an open meeting was held by the Board of Regents during which financial exigency and program elimination

were thoroughly discussed. Dr. Hoskinson appeared and spoke.

Drs. Christensen and Hoskinson were formally notified December 22, 1981, that their appointments would be terminated effective February 1, 1983. The notice included a statement of the basis for the decision, information concerning the manner in which the decision was reached, and the professors' rights to a review by the Faculty Status Committee. Under *Johnson,* this notice met the minimum necessary to adequately allow for preparation of a response.

Both parties agree the hearing itself was in reality an informal procedure. The professors were allowed to provide copious written material outlining their positions, and were given the opportunity to discuss their objections with two members of the Committee. Although they were not given the opportunity to have their attorney orally argue their case before the Committee, they did have legal counsel during the process.

The task of the Committee was to consider the following issues:

(a) Whether there was a bona fide state of financial exigency;
(b) Whether there was a material deviation from the procedures established [by the guidelines and criteria contained in the University's published financial emergency layoff plan] in reaching the decision;
(c) Whether the basis for the decision is consistent with the criteria established by the guidelines [contained in the University's published financial emergency layoff plan] and whether there was sufficient evidence to support the factual premise upon which the decision was based.

After the Committee's recommendations were forwarded to President Terrell, the professors were given the opportunity to respond in writing, which they did.

The *Mathews v. Eldridge, supra,* balancing test must be applied to these procedures, keeping in mind that strict adherence to the University's written procedures is not required as long as the minimal due process requirements

of federal constitutional law are met. *Danielson,* at 797 n.3. First, the professors have a significant interest in retaining their employment. Second, as noted by *Refai v. Central Wash. Univ., supra* at 16, the risk of erroneous termination, where a policy decision concerning financial exigency forces layoffs, is not as serious as where an employee is discharged for misconduct. Thus, a formal hearing before a hearing officer, or the full Committee, with the entire panoply of procedural safeguards would not be necessary as long as the professors had a meaningful opportunity to show:

> (1) that the true reason for his or her lay–off was a constitutionally impermissible reason; or (2) that, given the chain of decisions which preceded the ultimate decision designating him or her by name for lay–off, that ultimate decision was nevertheless wholly arbitrary and unreasonable.

*Washington Educ. Ass'n v. State, supra* at 909 (quoting *Johnson,* 377 F. Supp. at 240). The review undertaken by the Faculty Status Committee here did afford the professors that opportunity. In fact, the Committee was concerned about the issue of whether a bona fide financial exigency existed and "questioned" whether such a condition actually existed. The Committee, however, found against them on the procedural and factual issues regarding the decisions made. We conclude Drs. Christensen and Hoskinson had a meaningful opportunity to argue why the proposed termination should not occur.

Finally, the administrative buren of providing a more formal hearing is slight. However, given the limited utility of a more formal hearing, as regards any added check against an erroneous determination, *Refai,* at 16, and the fact that in this case the hearing occurred prior to the effective date of the termination, on balance Drs. Christensen's and Hoskinson's rights to procedural due process were adequately protected.

The next issue raised is whether the University's procedures violated the appearance of fairness doctrine. Drs.

Christensen and Hoskinson contend President Terrell's role as final arbiter of the appeal of his own decision to terminate them violates Washington's appearance of fairness doctrine.

First, as noted, all decisions prior to the actual determination that Drs. Christensen and Hoskinson be terminated were nonadjudicatory decisions, and thus did not involve adjudicative facts; the appearance of fairness doctrine does not apply to these actions. *See Harris v. Hornbaker*, 98 Wn.2d 650, 658 P.2d 1219 (1983). The recommendation to eliminate the Office Administration Program, with its attendant impact on Drs. Christensen and Hoskinson, was made by the College of Business and Economics, not President Terrell. The final document was approved by the Board of Regents.

Next, the actual decision to terminate Drs. Christensen and Hoskinson was made by the academic vice–president and provost, consistent with that part of the procedures for faculty personnel actions contained in the document entitled "Faculty Personnel Actions Under Conditions of Financial Emergency". Appeal procedures vested final authority in the president.

*Washington Educ. Ass'n v. State, supra*, under similar facts, concerned a similar contention regarding violation of the appearance of fairness doctrine. There, the district Board of Trustees made the initial policy decision regarding the necessity for reductions, and then made the final decision regarding dismissals. The court held such a dual role is permissible. *Washington Educ. Ass'n v. State, supra*. This is consistent with the rule that a mere combination of functions (legislative and adjudicative) will not be sufficient to invoke the appearance of fairness doctrine without a showing of bias. *Washington Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 479, 663 P.2d 457 (1983); *Smith v. Mount*, 45 Wn. App. 623, 627, 726 P.2d 474, *review denied*, 107 Wn.2d 1016 (1986). *See also Johnson v. Board of Regents*, 377 F. Supp. at 240. No showing of actual bias or ulterior motive has been demonstrated here.

Consequently, there is no violation of the appearance of fairness doctrine merely because of President Terrell's dual involvement during both the nonadjudicatory policy stage and the adjudicatory contested case stage.

Next, Drs. Christensen and Hoskinson contend President Terrell's decision to uphold the original decision to terminate was arbitrary and capricious. His letter upholding the original decision states:

> After reviewing the Faculty Status Committee report of March 2, 1982, and the information contained in the memorandum from you . . . dated March 8, 1982, I have decided to uphold the decision to terminate the faculty position currently held by you effective January 31, 1983.

Drs. Christensen and Hoskinson agree the president was not bound by the findings and recommendations of the Faculty Status Committee, but maintain if he disagreed, he must state some reason why. They also argue he treated the Committee's findings regarding a bona fide financial exigency as if they had found there *was* such a condition, when in fact they found the contrary. This latter contention is without merit. The letter upholding the termination decision does not indicate President Terrell ignored the Committee's questioning of the financial exigency, nor does it indicate he miscast their conclusion, as alleged by Drs. Christensen and Hoskinson.

The only relevant rules concerning the president's authority in this matter, cited to this court, were the previously discussed Faculty Manual and the supplemental document issued by the regents. The manual states, "The President shall notify each faculty member requesting the review of the President's decision within 15 days after receiving the [Faculty Status Committee's] report of findings". The regents' document is essentially the same, leaving the final decision with the president. The ultimate decision maker is not bound by a faculty committee recommendation, and is not required to state reasons for disagreeing with a committee's recommendation. *Smith v. Greene,* 86 Wn.2d 363, 370, 545 P.2d 550 (1976); *Amoss v.*

*UW,* 40 Wn. App. 666, 678, 700 P.2d 350 (1985); *Hasan v. Frederickson,* 37 Wn. App. 800, 683 P.2d 203 (1984). Thus, the question is whether President Terrell's action was unreasoning, and without regard to or consideration of facts and circumstances. There is no indication of that in the record. President Terrell stated he reviewed the Committee's report and the information contained in the professors' reply. The evidence with regard to financial exigency was equivocal. There is no question Governor Spellman ordered cuts. It cannot be said President Terrell's actions were arbitrary and capricious in rejecting the Committee's questioning of a financial exigency.

The final issue is whether the trial court erred in declining to decide the issue of whether WSU's efforts to transfer Drs. Christensen and Hoskinson to other positions within the University were sufficient. The trial court ruled the issue had not been properly brought before it. The Faculty Manual states:

> *Before an appointment is terminated* because of the discontinuance of a program of instruction, the institution will make an effort to transfer the affected faculty member to a position for which he or she is qualified.

(Italics ours.) Drs. Christensen and Hoskinson, on appeal to the superior court, contended the University's efforts to transfer them were either nonexistent or perfunctory. The Faculty Status Committee, in its findings and recommendations, noted that from March 1981, when WSU first considered abolishing the Office Administration Program, until December 1981, "no real efforts were made in attempting to relocate the affected members within the University, although they are apparently capable of many professional activities that would continue to aid the University". The Committee recommended that the University undertake every effort to place Drs. Christensen and Hoskinson in other positions at WSU.

The difficulty presented in reviewing the University's efforts to reposition these professors is that the review by the superior court, and this court, must be on the

record of the administrative hearing, not what came later. *Stastny v. Board of Trustees,* 32 Wn. App. 239, 245, 647 P.2d 496, *review denied,* 98 Wn.2d 1001 (1982), *cert. denied,* 460 U.S. 1071, 75 L. Ed. 2d 950, 103 S. Ct. 1528 (1983); *see also* RCW 28B.19.150(6). The Faculty Manual clearly states efforts are to continue until termination, and termination, under any reasonable interpretation of that term, did not occur until February 1983, approximately 9 months after the final decision was rendered by President Terrell. As such, the trial court was correct in denying review on this issue.

In conclusion, we do not find WSU's actions violated Drs. Christensen's and Hoskinson's rights to procedural due process, nor did those procedures violate the appearance of fairness doctrine. After reviewing the record, we are not left with a "firm conviction" WSU committed a mistake either in its declaration of a financial exigency or its decision to terminate the positions held by Drs. Christensen and Hoskinson. Nor can we say President Terrell's decision to uphold the termination was arbitrary and capricious or contrary to law. As such, we affirm the Superior Court.

GREEN and MUNSON, JJ., concur.