Judith KLEIN et al., Plaintiffs,

v.

The BOARD OF HIGHER EDUCATION OF the CITY OF NEW YORK et al., Defendants.

No. 76 Civ. 3919 (MP).

United States District Court, S. D. New York.

July 26, 1977.

Sturm & Perl, New York City, by W. Harvey Mayer, New York City, of counsel, for plaintiffs.

W. Bernard Richland, Corp. Counsel, New York City, by Robert S. Deutsch, Asst. Corp. Counsel, and Michael D. Solomon, Associate Counsel, Mary P. Bass, Gen. Counsel, Bd. of Higher Education, New York City, of counsel, for defendants.

POLLACK, District Judge.

This suit was tried to the Court at a bench trial and seeks equitable relief and damages in respect of lost employment with a public educational institution.

Jurisdiction hereof is posited on 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(3).

The facts are as follows:

The plaintiffs are eight former members of the City University of New York (CUNY) instructional staff who lost their positions in a retrenchment program implemented by CUNY in 1976 in response to the financial exigency created by state-mandated budget cuts. The defendants are the New York City Board of Higher Education (BHE),[1] present and former BHE members, CUNY's chancellor and presidents of various CUNY constituent branches.[2]

Plaintiffs claim that defendants' action in terminating their employment was arbitrary or capricious and that they were not afforded the procedural due process to which they are allegedly entitled.[3]

---

1. BHE was established by state law to govern CUNY, which is funded through a combination of money received from the state and city and student fees and tuition.

2. Plaintiffs have made no application for class certification.

3. Plaintiffs consented at trial to dismissal of all allegations in the complaint that the retrenchment program effected a denial of rights pro-

For the reasons appearing hereafter, the record fully establishes that no relief is due to the plaintiffs on their claims herein.

The evidence adduced at trial consisted exclusively of a set of stipulated facts and accompanying documentary exhibits. The evidence shows that all plaintiffs were tenured or certificated [4] or had received letters of reappointment for the period September 1, 1976 to August 31, 1977. All reappointments, whether by operation of tenure or certification or by letter, where made subject to CUNY's financial ability.

CUNY first learned of its budget for the 1976–77 fiscal year on June 12, 1976. The budget, approximately $470-million, resulted from emergency state legislation to re-open the school after it was closed for lack of funds in June 1976 and to provide financing for 1976–77. The appropriation was obtained only after CUNY agreed on June 1, 1976 to require payment of tuition. The 1976–77 budget represented a decrease of 13% from that for 1975–76, and was $108-million less than the amount requested by CUNY and approved by BHE on November 24, 1975.

CUNY allocated its budget among its various branches on the basis of a differential funding model. The model took into account differences in types of institutions, student/faculty ratios, program costs, and projected enrollment. The instructional component of each branch's budget was determined discipline-by-discipline, although no branch's budget was cut less than 10% regardless of the appropriate reduction indicated by the model. The branches were first informed of their respective budget reductions for 1976–77 on June 30, 1976.

On May 24, 1976 BHE adopted certain "Guidelines and Procedures for Retrenchment" of instructional personnel (Guidelines) and also directed CUNY to implement cost-saving arrangements for consolidation of various noninstructional resources. The Guidelines ordered the president of each CUNY branch to "determine after consultation with appropriate faculty and student representatives what programs or activities are to be cut back or terminated;" required that the retrenchment plans "set forth the reasons why reduction or termination of academic or non-academic service is required with respect to each department or function;" and commanded that the "reasons must be related to financial needs and be directed at the needs of the college and department or function."

The BHE Guidelines further stated the criteria to be used for determining which individuals must be discontinued. Within a given department, nontenured personnel were to be discontinued first, and then certificated personnel, and then tenured personnel. Within each class, instructional staff members were to be discontinued in inverse order of length of full time continuous service, except that among nontenured personnel seniority could be disregarded for "special educational reasons." Special educational reasons were defined as reasons which are nondiscriminatory against a person and are related to the needs of the retrenchment unit or college.

The Guidelines directed the branch presidents to determine the number of positions to be abolished in each retrenchment unit and, after such consultation with faculty committees as is deemed appropriate, identify the persons whose appointments were to be discontinued. The presidents were to then notify the affected persons at least 30 days before the discontinuances were to be effective, and, unless the entire retrenchment unit was to be abolished or the number of positions to be abolished was exactly equal to the number of nontenured persons, to inform them of the justification for discontinuance (either length of service or a specific special educational reason).

The Guidelines also set forth a review and appeals procedure. Discontinued per-

tected by the First Amendment or the Equal Protection clause of the Fourteenth Amendment of the Constitution.

4. Teachers granted administrative certificates of continuous employment are guaranteed reappointment (subject to certain conditions). BHE Bylaw § 6.4.

sons were given 20 days from mailing of the notice of discontinuance to request review by committees, appointed by the respective branch presidents, of at least three members of the instructional staff. No person who participated in the recommendation of the discontinuance of an individual was eligible to serve on the review committee for that person. The review committees were authorized to review all records and to conduct appropriate investigation. To an appellant was assigned the burden of proving that length of service had been incorrectly computed or that a special educational reason given was a pretext for action based on constitutionally prohibited grounds, and no other issues could be raised. Appellants were accorded the right to meet with the committees, present relevant evidence, and be represented by counsel or a union representative, but they could not question the persons who had made the discontinuance decision. The review committees were to make a report and recommendation to the chancellor or his designee (from outside the appellant's branch), who was to make the final decision and notify the appellant.

The CUNY branch presidents did develop written retrenchment plans, and in accordance with those plans plaintiffs were discontinued. Each plaintiff received a notice of discontinuance by letter in July 1976. The letters stated that plaintiffs' appointments were being terminated because of financial exigency, specified the procedure for exercising the right to appeal, and many stated that the termination in no way reflected on personal or professional performance. When a termination was based on grounds other than simple seniority the letter of discontinuance gave reasonably detailed explanations.

It was BHE's policy to make available seniority lists and retrenchment plans. Although some staff members were unable to obtain them within the time necessary to request review, prior to the hearing of their appeals, all plaintiffs had access to both.

Plaintiffs had the right to invoke the grievance-arbitration procedure in the collective bargaining agreement between BHE and their union for complaints charging that the Guidelines had been applied arbitrarily or discriminatorily. The arbitrator is not empowered to review BHE's budgetary decisions or rule on due process claims.

Plaintiffs claim that the action of defendants in retrenching them was arbitrary and capricious because the system managed by defendants was allegedly rife with wasteful practices and defendants knew of the impending budgetary problems yet did nothing to consult, plan ahead or save money and simply made "wholesale" reductions in the instructional staff at the last moment instead of cutting administrative costs. This claim is wholly unsupported by the record herein; on the contrary, the stipulated evidence makes clear that defendants' action in terminating plaintiffs was in no way arbitrary or capricious.

BHE's measures to cope with CUNY's budget gap began at least as early as July 28, 1975. At a BHE meeting on that date the Board took various actions in order to effectuate $54,300,000 in estimated savings, after hearing and receiving statements from, inter alia, four CUNY professors, including a member of the University Faculty Senate. Noting that "The main function of City University is to teach. In order to minimize the impact of budget cuts on teaching, budget reductions should be made in administrative and service areas as far as possible," BHE ordered no retrenchment of the instructional staff but did direct the chancellor to reduce administrative and support costs by at least $10-million.

BHE at the same July 28, 1975 meeting also ordered the CUNY branches to reduce their budgets by $32.7-million, directing them to consider, inter alia, reductions in other than personal service categories and reductions in the number of executive level administrative positions. The Board reminded the branch presidents that "things should be reduced before people" and that with respect to personnel reductions support services should be reduced before instructional services. Having noted that the Board and chancellor had held a series of intensive meetings with various constituent

groups within and outside CUNY, BHE directed that implementation of budget reductions by the branches be done in consultation with appropriate faculty and student representatives.

BHE adopted its first plan of retrenchment on August 15, 1975, after having heard comments and suggestions from representatives of the University Faculty Senate and Professional Staff Congress. That retrenchment plan declared that CUNY was in a state of financial emergency and promulgated a series of guidelines and procedures to remain in effect until June 30, 1976. The plan was essentially similar to the May 24, 1976 retrenchment plan, outlined above.

The May 24, 1976 retrenchment plan, pursuant to which plaintiffs were terminated, was not arbitrary or capricious. It directed each branch president to determine after appropriate consultation with faculty and student representatives what programs or activities (academic and non-academic) were to be cut back or terminated in a written plan to be distributed to department chairpersons; set forth criteria for determining which individuals must be discontinued; and promulgated a review process.

The BHE guidelines for retrenchment were reasonable: the reasons for reduction or termination of a service were required to be related to financial needs and directed at the needs of the college and function of the retrenchment unit.

The BHE criteria for selecting those staff members within a retrenched department to be terminated were likewise reasonable. Within each department, any staff member with tenure must be retained over all certificated or nontenured persons. Tenured and certificated persons were to be discontinued, respectively, in inverse order of seniority. Nontenured persons were to be discontinued in inverse order of seniority except for special educational reasons.

The specific retrenchment plans adopted by the CUNY branches were reasonable. For example, the Hostos Community College plan, adopted after discussion with a personnel and budget committee which included the elected chairpersons of all departments, mandated reductions in personal services of some $700,000 and reductions in categories other than personal services of $400,000. The latter included reductions in supplies, equipment, telephone usage, and facilities used. In the personal services category, seven deans' positions, four counselors, two alumni affairs officers, one registrar's office research assistant, and one dean's assistant were eliminated. Among the instructional staff, two-thirds of the terminations were in the school's nursing department, which was wholly abolished. Only one full professor and three associate professors were discontinued, and all of those except one associate professor were in the abolished nursing department.

Similarly, the Queens College plan, adopted after consultation with faculty and student representatives, mandated cuts of $1.2-million in the offices of the president and the vice president for administration.

The Hostos and Queens College plans gave detailed division-by-division or department-by-department explanations for the retrenchment decisions.

The City College plan mandated cuts of more than $500,000 for the buildings and grounds staff, and termination of 24 administrative positions (on top of 29 positions, costing $425,000, eliminated in 1975–76). Retrenchment of the City College instructional staff was done on the basis of enrollment patterns and consequent workload distributions.

■ Plaintiffs' claim that the challenged retrenchment was arbitrary or capricious is without foundation. All of the BHE and CUNY branch plans submitted are carefully reasoned, conscientious and detailed. They reflect strenuous efforts to minimize reductions in the instructional staff and to allocate budget cuts rationally and in the best interests of the CUNY community. The budget cuts imposed on BHE leave no room to doubt that spending reductions were required, and defendants fairly and reasonably implemented the requisite reductions

upon due consideration and on well-reasoned grounds.

■ Defendants have satisfied the Court that a bona fide financial emergency existed and that they adopted and applied a uniform set of procedures for meeting that emergency. *See Bignall v. North Idaho College*, 538 F.2d 243 (9th Cir. 1976). Defendants' actions were clearly within the discretionary area reserved to them by the Constitution. *See Johnson v. Board of Regents of University of Wisconsin System*, 377 F.Supp. 227 (W.D.Wis.1974), *aff'd*, 510 F.2d 975 (7th Cir. 1975).

[W]here lack of funds necessitate[s] releasing a sizeable number of the faculty, certainly it [is] peculiarly within the province of the school administration to determine which teachers should be released, and which retained.

Where there is a showing that the administrative body, in exercising its judgment, acts from honest convictions, based upon facts which it believes are for the best interest of the school, and there is no showing that the acts were arbitrary or generated by ill will, fraud, collusion or other such motives, it is not the province of a court to interfere and substitute its judgment for that of the administrative body. *Levitt v. Board of Trustees of Nebraska State Colleges*, 376 F.Supp. 945, 950 (D.Neb.1974).

■ Plaintiffs also claim that they were not afforded the procedural due process to which they were allegedly entitled.[5] This claim is wholly without merit. Most of plaintiffs' specific contentions are identical with those rejected in the two leading decisions concerning termination of public college faculty members because of financial exigency, *Bignall v. North Idaho College*, 538 F.2d 243 (9th Cir. 1976), and *Johnson v. Board of Regents of University of Wisconsin System*, 377 F.Supp. 227 (W.D.Wis.1974), *aff'd*, 510 F.2d 975 (7th Cir. 1975), and require little comment.

■ Plaintiffs were not entitled to hearings prior to the terminations decisions. *Bignall, supra*, 538 F.2d at 245–46; *Johnson, supra*, 377 F.Supp. at 239. Plaintiffs had no constitutional right to participate in the formulation of the retrenchment plans, *Johnson, supra*, 377 F.Supp. at 237–38, but defendants did in fact solicit and receive faculty opinion. Plaintiffs' attorney conceded at trial that "During the spring before these firings took place there were constant discussions between the union and the Board of Higher Education."

■ Plaintiffs were afforded post-termination hearings at which they could challenge the computation of their seniority or show that the special educational reason for retaining a less senior person was a mere pretext. The scope of those hearings was constitutionally adequate. Plaintiffs were not entitled to an opportunity to argue that no financial exigency existed or that CUNY should have imposed heavier fiscal sacrifices on other departments or non-academic areas. *Johnson, supra*, 377 F.Supp. at 239–40, 241. Defendants have proved the existence of the financial emergency in the present proceeding. Plaintiffs were given the opportunity to show that the true reason for a termination was participation in a

---

5. Plaintiffs were entitled to due process because they all had legitimate claims of entitlement to employment for the 1976–77 academic year by operation of tenure, certification, or contractual appointment. *See, e. g., Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) is not *contra*. There the Court held that the discharged public employee had no property right protected by the Fourteenth Amendment in his employment because he had no written contract and, as a matter of construction of the applicable state statute, "held his position at the will and pleasure of the city." 426 U.S. at 345, 96 S.Ct. at 2078. In the present case New York Education Law § 6206(1)(c), (11), BHE Bylaw § 6.4(d), and express written contracts gave plaintiffs an enforceable expectation of continued employment and reserved to defendants the right to discharge only in narrowly limited circumstances. These provisions constitute the rules supporting a claim of entitlement to employment which may be invoked at a hearing that make a person's interest in a benefit a property interest for due process purposes. *See Perry v. Sindermann, supra*, 408 U.S. at 601, 92 S.Ct. 2694, *quoted with approval in Bishop v. Wood, supra*, 426 U.S. at 344 n. 6, 96 S.Ct. 2074.

constitutionally protected activity or that given the chain of decisions preceding the ultimate decision terminating a particular person that ultimate decision was nonetheless unreasonable. Those procedures satisfied the dictates of due process.

■ Plaintiffs' assertion that the college hearings were inadequate because the hearing committee members were appointed by the branch presidents is untenable. *Bignall, supra,* 538 F.2d at 247; *Johnson, supra,* 377 F.Supp. at 240. Their claim that they had no opportunity to present witnesses is factually inaccurate. The Constitution does not require CUNY to produce witnesses for cross-examination at the hearings. *Johnson, supra,* 377 F.Supp. at 242.

■ Plaintiffs were permitted to request transcripts of the hearings to be made at their own expense. Plaintiffs were advised of the review committee decisions, at least after review by the chancellor or his designee. Plaintiffs were not entitled to a second hearing before the chancellor (or his designee) upon his review of the committee decision. *Johnson, supra,* 377 F.Supp. at 240.

Plaintiffs were accorded adequate notice. They were given written statements of the basis for the ultimate termination decision and they were afforded access to the seniority lists and retrenchment plans prior to the hearings. That some of those documents may not have been made available within the time set for filing notices of appeal caused no prejudice to those plaintiffs who did in fact file timely notices of appeal. There has been no claim or proof that the sole plaintiff who did not file a notice of appeal failed to do so because defendants provided inadequate time or information.

The procedural rights and protections afforded to plaintiffs, outlined earlier in this opinion, were more than ample to satisfy the requirement that they be given notice and opportunity for a hearing appropriate to the nature of the case in light of the competing interests involved. *See generally Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

Accordingly, judgment is directed to be entered in favor of defendants and against plaintiffs dismissing the complaint, with costs.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

SO ORDERED.