Fuchsberg, J.
(dissenting). In a proceeding brought pursuant to section 298 of the Executive Law (the Human Rights Law) and CPLR article 78, the underlying issue is whether there was substantial evidence to support a State Human Rights Appeal Board order affirming an order of the State Division of Human Rights, which had adjudged that the complainant, Moses Harary, had been discriminatorily discharged from his employment by reason of his employer CUNY-Hostos Community College’s resort to a formula, or quota, under which “race, color and ethnicity” impermissibly were the criteria for identifying the employees who, in the implementation of a budgetary retrenchment plan, were to be singled out for termination. By unanimously confirming “in all respects”, the Appellate Division upheld the board’s determination.
On this further appeal, Hostos and its president, Cándido de León, in effect repeat their earlier arguments that the division’s determination is grounded on no more than *82 “conjecture and surmise” and therefore “does not meet the substantial evidence test”.[1] Because the ensuing review of the record taken as a whole discloses the contrary, this position should be rejected.
But first I note the two guidelines by which it must be measured:
The first of these is the overriding fact that the Human Rights Law, which governs the conduct implicated in this case, was enacted, among other things, to assure that, consistent with fundamental tenets of our society, every individual receive an equal opportunity “to enjoy a * * * productive life” and “to participate fully in the economic * * * life of the state”. As relevant here, to implement these ideals, the statute flatly declares it an unlawful practice “[f]or an employer * * * because of * * * race, creed, color [or] national origin * * * of any individual * * * to discharge * * * or to discriminate against such individual”. (Executive Law, § 290, subd 3; § 296, subd 1, par [a].) And section 300 of this remedial legislation, recognizing that discrimination often travels under false colors, compels us to see that it is “construed liberally”.
The second guideline, also noted by the majority, is the limited range of judicial review of an administrative determination, especially one arrived at, as here, by an agency which of necessity has been called upon to develop and apply a highly sophisticated, sensitive and specialized ex *83 pertise in treating with the societal problem committed to its care (Matter of New York Roadrunners Club v State Div. of Human Rights, 55 NY2d 122, 126; cf. Matter of Burger King v State Tax Comm., 51 NY2d 614, 621; Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459). This means that the “inference-making function, as it is exercised at the evidentiary or fact-finding level, is exclusively that of the administrative agency” (State Div. of Human Rights v Wagner, 39 NY2d 865, 866). Or, as stated on another occasion, “neither the weight which might be accorded nor the choice which might be made by a court are germane upon an analysis for the presence of substantial evidence” (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 180). In like vein, realistically dubbing this principle the “doctrine of administrative finality”, the United States Supreme Court put it that, “[s]o long as there, is warrant in the record for the judgment of the expert body it must stand”, the judicial function being “ ‘exhausted when there is found to be a rational basis for the conclusions approved by the administrative body’ ” (Rochester Tel. Corp. v United States, 307 US 125, 139-140, 145-146; see, also, Davis, Administrative Law, 1982 Supp, § 29.00-1, p 520).
Mindful of these precepts, we are informed by the record here that Harary, who is white, Jewish and a native of the United States, was first appointed, with the rank of assistant professor, to his nontenured post as Hostos’ associate dean of administration and management planning as of September, 1972. Prior to his ultimate termination, effective June 17,1976, though Harary was assigned to what is acknowledged to have been the arduous and toe-stepping responsibility of reorganizing what had been the college’s morass-like management system, his immediate superior, Dean of Administration Theodore Foxworthy, was to testify that he never received a complaint of any substance concerning Harary’s performance. Indeed, it is undisputed that Foxworthy, who at the public hearing described Harary as highly competent and thoroughly knowledgeable in his field, on at least two occasions had backed this appraisal by recommending him for promotion. And, corrobo *84 ratively, de León, curiously in view of the inconsistent position he took at the hearing, not only had unreservedly recommended Harary’s reappointment for each of the three successive years in which he had the opportunity to do so but, only months before initiating the challenged discharge, had put Harary’s name in for a full professorship.
It was against this background that, in August, 1975, when his consecutive appointments in this new college had made him the second most senior member of his department, Harary was summoned to the office of de León. There, in the presence of Foxworthy, de León announced for the first time that he was not satisfied with Harary’s performance and suggested that he thereafter “devote full time looking for a job”. As Harary and Foxworthy described it, when the former then asked why de León was taking this action, the latter responded by saying the reasons were “anthropological”[2] and, when pressed for further explanation, would not give any details.
True, de León later was to deny that he had used the term “anthropological”, claiming instead that he had told Harary only that he was “not satisfied with his failure to communicate after repeated discussions with his lack of understanding of how our university works”. That there were, therefore, two versions on this point, of course but emphasizes that it was for the agency, and for it alone, to decide, as a simple question of fact, whether to accept the findings of the law judge who, after observing and hearing the witnesses, concluded that the account rendered by de León was the less credible, especially because, as the Human Rights Division’s decision observed, “if complainant were incompetent, he could have been discharged earlier”.
*85 Other parts of the record also gave legitimate reinforcement to the division’s express finding that Harary was not terminated for incompetence. A significant factor, for instance, was the strange coincidence that, as the division in effect determined, de Leon’s resort to a pretextual complaint followed almost immediately on the heels of a so-called statement of policy then newly adopted by the board of higher education, then the ultimate governing body of Hostos and the other municipal colleges of the City of New York. The statement, to meet a dire financial emergency, required each of the colleges to institute a drastic retrenchment plan effecting savings in personnel and programs. From this sequence of events, it was inferable that de León had been thinking of the criteria by which he would have preferred, if left to his own devices, to eliminate personnel.
The board thereafter was to issue guidelines which, as the division’s opinion points out, “provided that personnel in the main, be discontinued in inverse order of length of full-time continuous service; also, non-tenured personnel were to be discontinued first, then certificated personnel, and then tenured personnel. In the case of non-tenured personnel, seniority could be disregarded for ‘special educational reasons’. Since complainant did not hold a teaching position, this latter exception could not be applied to him. Thus, under the guidelines laid down by the Board of Higher Education, seniority was to govern”.[3]
It is noteworthy too, or so the division could see it, that, when the guidelines came down, though Harary then had not yet been formally severed and at worst was in limbo,[4] de León did not restore him to the status to which he was *86 entitled as second senior employee in his category. Moreover, although the board’s announced policy, as the majority today acknowledges, was to release administrators rather than teachers, it was also its policy, when possible, to reassign qualified administrators to teaching positions. Despite the fact that Harary could have been viewed as qualified to teach at Hostos, his file indicating that he not only had extensive knowledge of accounting and engineering but had taught economics, public speaking and operational planning, he was the only retrenched dean not offered a teaching position. In short, even when seniority or ability to teach each became a governing consideration, de León excluded Harary from its benefits. And all this though the record contains direct evidence that most of Harary’s administrative functions were not eliminated but turned over to a newly engaged employee who, like de León, was of Hispanic background.
All of this and more the division could weigh in light of the nature of the retrenchment plans de León himself then promulgated. Impossible to ignore, for instance, is the reality that the 82 persons, including Harary by name, whose release they projected, consisted of individuals whose ethnic distribution for all practical purposes were well-nigh perfect matches of the pre-existent college staff population, divided by the de León plans into what essentially were three groups classified as “White”, “Black” and “Hispanic”. To be precise, 101 “White” persons comprised 29.4% of staff before the retrenchment while the 74 who remained after the plans had been put in place came to an almost identical 28.5%. Likewise, 95 “Black” persons comprised 28% of staff before the retrenchment, while the 71 who remained when the plans had taken their toll amounted to 27.3%. In presenting the same picture, the preretrenchment number of “Hispanic” employees was 135, or 39.4%, and the postretrenchment number was 109, or 41.9%.
*87 The revealing nature of these statistics need not have escaped the division’s notice (State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 210 [statistics in such cases “are valuable and often demonstrate more than the testimony of witnesses, ‘and they should be given proper effect’”]). Granted that “some statistical correlation between those retained and those discharged was inevitable” (majority opn, at p 79), the mathematical probability against the nearly perfect correlation of a combination of three different groups is so great that it all but conclusively rebuts the possibility that it was the product of chance.
But the plans’ explicitness left nothing to the imagination. They expressly advised that their purpose was to make sure that “no significant difference will take place in the ethnic distribution of the faculty”.[5] Thus, although, as the majority points out, the fiscal emergency which prompted the plans presented the possibility that, willynilly, aberrant conditions might result, the de León plan was meticulous in guaranteeing that, whatever and however the pre-existing ethnic distribution had come about, it was to be treated as an immutable quota. The more is this so since, as I am glad to see we all agree, discrimination in employment, whether it be achieved by a hiring quota under which its targets, if ever reached, are the “last in”, or whether it be achieved by a firing quota under which targets are the “first out”, especially under a statute intended to be liberally construed to guarantee equal opportunity to enjoy a “productive life”, is equally invidious.
Needless to say, the figures cannot be ignored. So the majority, adopting Hostos’ and de Leon’s rationale, accepts them as “more a report of the results after formulating the plan of retrenchment than a design for retrenchment” (emphasis in original), language which, reasonably read, fairly concedes that it would be rational for the division to have interpreted the matter either way. And, as to the support the majority sees in de Leon’s testimony that plans were discussed with Hostos’ affirmative action office and *88 others, suffice it that the plans, once found to be discriminatory, would be no less so because they were the handiwork of many rather than that of one or few, or because they bore the imprimatur of an official college agency.
This is not to assume that the preretrenchment ethnic distribution of the Hostos faculty was in fact the product of discrimination. An academic institution, to foster intellectual creativity and achievement, is to be accorded wide latitude in determining, among other things, who will teach its students (Matter of Pace Coll. v Commission on Human Rights of City of N. Y., 38 NY2d 28, 38). So, when an institution believes the promotion of ethnic pluralism will be beneficial educationally, ethnic considerations, if not the sole determinants for selection, may, along with other facts reasonably related to the employment, such as training, experience, education, pedagogical talent or the like, be taken into account (University of Cal. Regents v Bakke, 438 US 265, 317 [opn of Powell, J.]; Matter of Fullilove v Beame, 48 NY2d 376, 379-380 [dissenting opn];[6] to the same effect, see Education Law, § 6201, subd 3 [“equal access and opportunity”]).
Here, the preretrenchment mix was not challenged and so no evidence was produced by either side to prove whether it was or was not the product of discrimination. For all we know, then, the pre-existing racial balance conceivably may have come about either through chance or through a salutary and constructive affirmative action effort which, adhering to the dictates of Bakke, stopped short of disregarding the basic principle of merit selection, or through a combination of both. But, however unchallengeable the pre-existing ethnic distribution, to automatically and arbitrarily engage or discharge persons merely to *89 maintain the same ratio runs afoul of the spirit and letter of the law.
The division’s determination that the prescribed de León formula for the severance of Hostos’ employees was discriminatory having, therefore, well met the requirements of the substantial evidence rule, I now turn to the proof of causal connection between the quota and Harary’s termination.
For this purpose, it is immediately noteworthy that the division, having decided to give the benefit of the doubt to de León on the charge that he had acted on considerations of creed and ethnicity as such in removing Harary, carefully distinguished such a violation from one “constitut[ing] * * * a deliberate effort to perpetuate unlawful quotas based on the ethnicity of employees”.
Available to be weighed in the balance on the latter theory were a number of what the administrative agency could treat as telling factors. One of these is that, although Harary was second in seniority among the deans, he was not one of the two spared retrenchment. In this connection, while de Leon’s hypersensitive attitude towards Harary’s creed was not enough to convince the division that this was the per se reason for his discharge, its circumstantial significance need not have been ignored in the context of the preferment of at least one of the retained deans in disregard of Harary’s seniority. In addition, and of prime significance, could be the fact that Harary, as mentioned earlier, was the only retrenched dean not to be offered a teaching position notwithstanding the board of higher education’s policy recommendations to the contrary.
In sum, review of the record discloses more than sufficient evidence to compel us to sustain the division’s conclusion that Harary was discharged in furtherance of Hostos’ and de Leon’s enforcement of the impermissible criteria at the heart of the retrenchment plan.
Accordingly, I vote to affirm the order of the Appellate Division.[7]
*90 Chief Judge Cooke and Judges Jasen, Jones and Meyer concur with Judge Simons; Judges Wachtler and Fuchs-berg dissent and vote to affirm in separate dissenting opinions.
Order reversed, with costs, and petition granted.

. Hostos and de León also contend, preliminarily, that the administrative law judge abused his discretion in permitting amendment of the complaint to allege the existence of a quota after both sides had rested. But section 297 (subd 4, par a) of the Executive Law, in pertinent part, provides, without time limitation, that “[tjhe division or the complainant shall have the power reasonably and fairly to amend any complaint, and the respondent and any other party shall have like power to amend his answer”. In their briefs to our court, they allege no particular prejudice as a result of the amendment, nor do they claim they were denied a corresponding opportunity to amend their answer. Nor was any asserted when, at the time the motion was granted, the law judge specifically noted that there had been “sufficient testimony” concerning the facts at issue on such a theory during the lengthy period over which the hearing had stretched. Moreover, though the law judge alerted the parties to the possibility of requesting reopening during the four weeks he allowed for submission of posthearing briefs, no such application was ever made. Under these circumstances, it cannot be said that the grant of the amendment was an abuse of discretion as a matter of law (cf. CPLR 3025, subd [b]; 3 Weinstein-Korn-Miller, NY Civ Prac, pars 3025.13, 3025.16).

. Anthropology, a somewhat comprehensive science, includes among its major interests consideration of the racial classification, group relationships and cultural history of man (Webster’s Third New International Dictionary [1971], p 93). Here there was support in the record for the inference that de León was concerned with the racial connotations of the term. This included proof of a request to Professor Gladys Aponte, Hostos’ labor relations designee, that she help him replace white personnel by “bringing] more Puerto Ricans aboard” and a comment that the board of higher education “is full of Jews and they help each other”.

. While the division observed that these guidelines had been “discussed” in Klein v Board of Higher Educ. (434 F Supp 1113), the discrimination issue was not involved in that case. At stake there were two issues only. One was simply whether the guidelines and plans deprived those plaintiffs, certificated or tenured employees, of procedural due process by denying them a hearing. The second was the highly questionable claim that no bona fide financial emergency justified the retrenchment.

. Contrary to the majority’s assertion that Harary was “discharged orally” in August, 1975, and that it was, therefore, “only natural that he should be included in the retrenchment plans in 1976”, it was within the competence of the division to conclude from the record that, though an intention to terminate was expressed at the earlier date, a discharge in fact was not effected until the implementation of the plans. Furthermore, *86 the record contains evidence not only that Harary’s salary was continued until he suffered the ultimate severance, but that he continued to perform actively, though on a reduced schedule, through the balance of his stay. Most conclusively, it was judicially established in a separate article 78 proceeding, which focused on the inadequacy of even the ultimate notice to discharge, that Harary was not given effective notice of his termination at the August, 1975 meeting.

. I have emphasized the common word “will” because Webster’s New International Dictionary (2d ed) describes it as an auxiliary verb used, as here, to form a “future tense phrase”.

. “ ‘Affirmative action’, therefore, contemplates measures such as the reinstatement or upgrading of those who have been discriminated against, the recruitment of members of disadvantaged groups and the opening up of opportunities for attaining vocational skills that will enable them to compete in the labor market. While, at times, impatience with the pace of acceptable methods has led some to resort to quotas and programs of reverse discrimination, concepts quite different from equal opportunity (cf. Alevy v Downstate Med. Center, 39 NY2d 326, 336-337), it is not to be assumed that a program of affirmative action necessarily encompasses preferential treatment”.

. Since the majority’s disposition renders the damage issue academic at this point, I do not find it necessary to set out my reasoning in that regard.